PEARSON, J.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| DIANE M. PORTER, *et al.*, | ) | |
| | ) | CASE NO. 1:19CV2612 |
| Plaintiffs, | ) | |
| | ) | JUDGE BENITA Y. PEARSON |
| v. | ) | |
| | ) | |
| CUYAHOGA COUNTY, *et al.*, | ) | **MEMORANDUM OF OPINION** |
| | ) | **AND ORDER** |
| Defendants. | ) | [Resolving ECF Nos. 37 and 47] |

Pending is Defendant Schindler Elevator Corporation's Motion for Summary Judgment (ECF No. 37).[1] For the reasons set forth in Section III below, the motion is denied.

Also pending is Defendant Schindler Elevator Corporation's Motion to Strike the Affidavits of Todd S. Hochman, M.D. and Michael Vallone (ECF No. 47). For the reasons set forth in Section IV below, the motion is granted in part and denied in part.

### I. Stipulated Facts

The stipulated facts[2] are as follows:

1. As of February 13, 2017 Joey R. Porter was and is the husband of Diane Porter.

2. On February 13, 2017, Diane M. Porter was an employee of the Cuyahoga County Child Support Enforcement Agency. Her position was Support Officer II.

---

[1] Plaintiffs Diane M. Porter and Joey R. Porter's Fed. R. Civ. P. 56(c)(2) Objections to Claimed Facts (ECF No. 41) is overruled for the reasons that have been articulated in the Reply (ECF No. 46) on which Defendant relies. The Court has, therefore, considered ECF No. 37 in its entirety in the interests of justice.

[2] *See* Parties' Joint Stipulation to Uncontested Facts (ECF No. 38).

(1:19CV2612)

3. On February 13, 2017, Ms. Porter, while employed by the Cuyahoga County Child Support Enforcement Agency, was working at the Virgil E. Brown Building, located at 1640 Superior Avenue, Cleveland, Ohio 44114.

4. On February 13, 2017, Gary Evans was an employee of Cuyahoga County.

5. On February 13, 2017, Gary Evans, while employed by Cuyahoga County, was working at the Virgil E. Brown Building.

6. The elevators at the Virgil E. Brown Building are owned by Cuyahoga County, Ohio.

7. Schindler Elevator Corporation entered into contracts with Cuyahoga County for the purpose of repair and maintenance of elevators and escalators in County buildings. The contracts included the elevators within the Virgil E. Brown Building, located at 1640 Superior Avenue Cleveland, Ohio 44114. The initial contract covered the period from April 1, 2009 until March 31, 2012. There was a subsequent bid process, which began on September 16, 2013, and eventually resulted in another contract between Schindler and the County, dated December 3, 2013 for an additional three-year term. *See* Repair and Maintenance Agreement (ECF No. 32-1), which incorporates the Request for Bids (ECF No. 34-2).

8. Schindler and Cuyahoga County amended and extended the contract in 2016 for an additional one-year term, through November 30, 2017.

9. On September 15, 2016, Schindler entered into an Upgrade Order Agreement with Cuyahoga County (ECF No. 33-1) regarding Elevators #4 and #5 at the Virgil E. Brown Building. It would require installation of new front openings at the "G" level (ground level) on elevators #4 and #5 (city #S552, S553), cutting holes through a wall for entrances and properly

2

(1:19CV2612)

protecting the area during work, providing and installing stainless steel entrances and hoistway doors, installing hoistway door hardware and wiring, the addition of a hall station at the "G" level and a call button in the car operating panel for floor G, and new 3D infrared door detection devices added to each car door. Additionally, Schindler would modify the software and control system as needed to accommodate new openings.

10. Schindler completed the upgrade order construction work on Elevator #4 and #5 in late January or early February 2017.

11. A Schindler job ticket dated February 3, 2017 states, "INSPECTION WITH THE CITY OF CLEVELAND, WAYNE MOORE AND ANDY VALEK, SR, PEEL PROTECTIVE FILM CLEAN UP, LEAVE BOTH CARS OUT OF SERVICE PER LAWRENCE DESOTELL" ECF No. 33-4.

12. Elevator #5 at the Virgil E. Brown Building is a geared overhead traction elevator, 2500 lb. capacity Montgomery Mi-prom 21 with 36" x 7' center parting side-slide doors. The elevator has one front, single speed, center opening entrance that serves all seven floors.

13. Timothy Lieb was an employee of Schindler at times prior to, on, and after February 13, 2017. His position was Elevator Mechanic, and was the mechanic assigned to a route including the Virgil E. Brown Building beginning in 2015.

14. Sometime prior to and on February 13, 2017 the lock on the door on the control operating panel ("COP") of Elevator #5 was not working properly.

15. Located behind the door on the COP on Elevator #5 are a series of switches, including a switch known as the "light ray rocker," which if turned off disables the light ray door

3

(1:19CV2612)

protection device, thereby preventing the doors from reopening if an individual or object is between the elevator doors when the doors begin to close.

16. Sometime prior to February 13, 2017, Lawrence Desotell, the Maintenance Supervisor of the Virgil E. Brown Building, had discussions with Lieb regarding the need to repair or replace the locks on the doors in Elevator #5 and other elevators at the Virgil E. Brown Building.

17. On Friday, February 10, 2017, Lieb was at the Virgil E. Brown Building for 1.3 hours, and his job ticket states, "Turned Elev 4 and 5 to normal service after a floor was installed. Changed the up hall call button on the 1st floor."

18. The Virgil E. Brown Building was closed to the public on Sunday, February 12, 2017.

19. On Monday, February 13, 2017, at approximately 10:40 a.m., Ms. Porter, when entering Elevator #5 at the Virgil E. Brown Building, was struck by both elevator doors when they closed upon her without any warning while she was between the doors.

20. On February 13, 2017, Evans entered Elevator #5 in front of Ms. Porter. He witnessed Ms. Porter pinned between the doors; could not open the elevator doors using the electronic buttons; and, forcefully pried open the elevator doors by hand to free Ms. Porter.

21. Immediately following the door closing incident, Ms. Porter and Evans went to see Desotell, and Ms. Porter also reported the incident to the Security personnel at the Virgil E. Brown Building and filled out an Incident Report.

(1:19CV2612)

22. On February 13, 2017, and in response to this incident, Lieb stated in a job ticket, "The elevator was shut off by the customer. The light ray rocker switch was shut off, causing the doors to close with no protection. Spoke with the building about getting locks and latches installed."

## II. Background

On February 12, 2019, Mr. and Ms. Porter filed suit in the Cuyahoga County, Ohio Court of Common Pleas, being Case No. CV-19-910926. The Porters brought this negligence action alleging common law tort claims for personal injury and loss of consortium. Because Ms. Porter was working at the time she was injured, she was entitled to and Plaintiff Ohio Bureau of Workers' Compensation's ("OBWC") did in fact provide medical treatment and indemnity compensation to her pursuant to Chapter 4123 of the Ohio Revised Code. As result of paying for medical treatment and making indemnity payments to Ms. Porter, the OBWC has presented a claim against both Ms. Porter and Schindler for the statutory right of subrogation afforded in Ohio Rev. Code § 4123.931 in the amount of workmen's compensation benefits paid or reasonably expected to be paid in the future as a result of Ms. Porter's injuries.

On November 8, 2019, Schindler filed a Notice of Removal (ECF No. 1) to the United States District Court for the Northern District of Ohio, on the grounds of diversity jurisdiction.[3]

## III. ECF No. 37

### A. Standard of Review

---

[3] All other Defendants had been dismissed while the case was pending in state court. Plaintiffs dismissed their claims against Cuyahoga County, Ohio because it was immune as the employer of Ms. Porter.

5

(1:19CV2612)

Summary judgment is appropriately granted when the pleadings, the discovery and disclosure materials on file, and any affidavits show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also* Johnson v. Karnes, 398 F.3d 868, 873 (6th Cir. 2005). Fed. R. Civ. P. 56(c)(1)(a) requires a party requesting summary judgment in its favor or an opposing party "to go beyond the pleadings" and argument, Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986), and cite to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." The moving party must "show that the non-moving party has failed to establish an essential element of his case upon which he would bear the ultimate burden of proof at trial." *Guarino v. Brookfield Twp. Trustees.*, 980 F.2d 399, 403 (6th Cir. 1992).

Once the movant makes a properly supported motion, the burden shifts to the non-moving party to demonstrate the existence of genuine dispute. An opposing party may not simply rely on its pleadings. Rather, it must "produce evidence that results in a conflict of material fact to be resolved by a jury." *Cox v. Ky. Dep't. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995). The non-moving party must, to defeat the motion, "show that there is doubt as to the material facts and that the record, taken as a whole, does not lead to a judgment for the movant." *Guarino*, 980 F.2d at 403. In reviewing a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party when deciding whether a genuine issue of

(1:19CV2612)

material fact exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970).

The United States Supreme Court, in deciding *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986), stated that in order for a motion for summary judgment to be granted, there must be no genuine issue of material fact. *Id.* at 248. The existence of some mere factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *Scott v. Harris*, 550 U.S. 372, 380 (2007). A fact is "material" only if its resolution will affect the outcome of the lawsuit. In determining whether a factual issue is "genuine," the court must decide whether the evidence is such that reasonable jurors could find that the non-moving party is entitled to a verdict. *Id.* Summary judgment "will not lie . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* To withstand summary judgment, the non-movant must show sufficient evidence to create a genuine issue of material fact. *Klepper v. First Am. Bank*, 916 F.2d 337, 342 (6th Cir. 1990). The existence of a mere scintilla of evidence in support of the non-moving party's position ordinarily will not be sufficient to defeat a motion for summary judgment. *Id.* (citing *Anderson*, 477 U.S. at 252).

**B.**

Schindler's Motion for Summary Judgment seeks judgment in Defendant's favor as to the issue of liability alone. Schindler does not address or move for summary judgment as to Plaintiffs' damages. *See* ECF No. 47 at PageID #: 1726.

As part of the Upgrade Order Agreement, Schindler and the County agreed that Schindler would install new 3D infrared door detection devices on Elevators #4 and #5. *See* ECF No. 38 at

7

(1:19CV2612)

PageID #: 1543, ¶ 9. In late January or early February 2017, a photocell type reopening device was removed by Schindler installers and replaced by the new 3D device. *See* ECF No. 38 at PageID #: 1543, ¶ 10. On February 10, 2017 – the Friday before the Monday elevator incident – Lieb worked on Elevator #5. ECF No. 38 at PageID #: 1543, ¶ 17. Whether the new door reopening device was installed and wired correctly is a genuine dispute of material fact and the primary issue in the case at bar. Michael Vallone, Plaintiff's elevator expert, extensively discusses the reasons why he opines that the new reopening device in Elevator #5 was improperly wired and directly caused the injuries to Ms. Porter. *See* Expert Report (ECF No. 34-1 at PageID #: 1458-59) and Deposition (ECF No. 34 at PageID #: 1431-37) of Michael Vallone. Vallone testified as follows during his discovery deposition:

> Q And so how is it not wired to operate that way?
>
> A Because it was disabled.
>
> Q It could be --
>
> A *It's not allowed to be wired to be disabled.*
>
> Q It could be disabled?
>
> A It was disabled in this case.
>
> Q Okay. It was disabled, but the wiring of itself allowed it to possibly be disabled at some point, is that your testimony?
>
> A Yeah. *The way they wired it was the reason that it was disabled on the day of the incident.*
>
> Q Okay. And how was it wired?
>
> A They wired it through the photocell cutout switch.

(1:19CV2612)

> Q   And why is that improper?
>
> A   *Because you're not supposed to be able to disable or make inoperative a safety device on an elevator.*
>
> Q   Where does that come from?
>
> A   ASME A17.1 Section 8.6.1.6.1.
>
> Q   Okay. Go over that slowly for me.
>
> A   Sure. ASME Al7.1.
>
> Q   Got it.
>
> A   I'm in the 2000 version. And it's section 8.6.1.6, which is general maintenance methods and procedures, and then if you go to 8.6.1.6.1 it's titled, "Making safety devices inoperative or ineffective," and it states that, "No person shall at any time make inoperative or ineffective any device on which safety of users is dependent, including any electrical protective devices except where necessary during tests, inspections, maintenance, repair and replacement, provided that the installation is first removed from normal operation. Such devices shall be restored to their normal operating condition in conformity with the applicable requirement prior to returning the equipment to service."
>
> Q   So there are instances, such as repair and maintenance, when you can disable a safety device?
>
> A   Yeah, but *they cannot be disabled during normal operations* so it states.
>
> Q   So if the switch was for only authorized users, somebody doing maintenance or repair --
>
> A   Authorized users don't do maintenance and repair. Elevator personnel perform maintenance and repair. Authorized users [--] that's not their function.
>
> Q   So if you place this switch behind a locked panel, for authorized use only, would you have an issue?

9

(1:19CV2612)

> A   Yeah, that still doesn't meet the code. *The code does not say that it can be disabled by authorized users.* It says it can be disabled during maintenance and repair. And maintenance and repair is conducted by elevator personnel, not authorized users.
>
> Q   There's reference --
>
> A   There's very specific definitions in Al7.1 of what those two things are.

ECF No. 34 at PageID #: 1432:17-1435:4 (emphasis added).[4] Vallone conducted an on-site inspection of Elevator #5 on November 17, 2020, at which time he "verified that the photocell cutout switch still does disable the door reopening device." ECF No. 34 at PageID #: 1399:14-16.

Sometime prior to and on February 13, 2017 the lock on the door on the control operating panel ("COP") of Elevator #5 was not working properly. *See* ECF No. 38 at PageID #: 1543, ¶ 14. At the time the new door reopening device was installed in Elevator #5 in late January or early February 2017, the claimed disrepair of the lock should have been evident to the Schindler installers, since Lieb maintains that he discussed the disrepair with Desotell[5] on several occasions before Ms. Porter's injury. *See* Deposition of Timothy Lieb (ECF No. 28) at Page ID #: 786:15-787:15. Therefore, there is a genuine issue of material fact over whether the installers failed to act, in light of such an obvious problem. The parties disagree whether the Schindler installers of the new door reopening device should have alerted the County to add to the Upgrade

---

[4] ECF No. 34 is not in PDF text searchable format. Counsel are reminded not to file scanned pleadings, motions, and other papers. "Electronically filed documents should be in PDF text searchable format whenever possible." Electronic Filing Policies and Procedures Manual (Feb. 10, 2020) at Section 9.

[5] Desotell has unfortunately passed away. *See* ECF No. 37 at PageID #: 1527.

(1:19CV2612)

Order Agreement the installation of new locks to ensure passengers could not access the key switches in the COP. Whether an unauthorized individual turned off the new door reopening device because the existing access panel lock was inadequate and did not lock securely, or a Schindler installer or Lieb left the old on/off switch in the "off" position is a matter for the jury to decide.

**C.**

The Repair and Maintenance Agreement provides, in relevant part:

**C. SERVICES.**

C.1. The intent of these specifications is to facilitate the following, without limitation (the "Services"):

- Consistent safe operation of all Equipment

\* \* \* \*

ECF No. 34-2 at PageID #: 1484. While Schindler agreed to provide "Services" for the safe operation of elevators for areas and duties assumed under the contract, the Maintenance Agreement also provides:

**E. EXCEPTIONS to SERVICES.** The Contractor shall be responsible for all Equipment, except as otherwise set forth in the Contract.

E.1. Elevators:

E.1.1 The County shall be responsible for maintenance and repair of elevator cab interiors, including cab floors, interior walls, and doors, except where damage to the same is the result of action or inaction by Contractor. *Operational fixtures remain the responsibility of the Contractor; cab interior lights are the Contractor's responsibility; light bulbs will be furnished by the Contractor.*

\* \* \* \*

11

(1:19CV2612)

ECF No. 34-2 at PageID #: 1490 (emphasis added). According to Schindler, there was an unambiguous exception for maintenance and repair of the interior of the elevators – most importantly the locks for the car operating panel door. Lieb, an employee of Schindler, attests: "7. At all times during my tenure as a route mechanic or technician at the Virgil E. Brown Building, I understood that any repairs to the interior panel doors and specifically the locks, were the responsibility of the County under the contract Schindler had with it." Affidavit of Timothy Lieb (ECF No. 37-1).

    Vallone, however, testified to the contrary:

Q    So you've already agreed with me that the service panel door, service door, is part of the elevator cab interior, correct?

A    Correct.

Q    And so this contract dictates specifically that maintenance of that door is the county's responsibility, doesn't it?

        MR. BILFIELD:    Objection.

A    *It doesn't specifically call out that door. It depends on what you consider that door.*

Q    Well --

A    *If it's an operational fixture, that there's operational fixtures behind it, it wouldn't be their responsibility. Just depends on how you -- what you consider that door.*

Q    You've already agreed with me that the service panel door would be part of the elevator cab interior, correct?

A    I did, and then I read this again and --

Q    Now --

(1:19CV2612)

A      -- that's what I'm saying. *It depends on how you read this as operational fixtures.*

Q      Well --

A      *It could be part of the cab interior or could be considered an operational fixture because it's got a lock on it that's specific to elevators.*

Q      Operational fixtures seems to me to be something that would operate the elevator?

A      Every button behind that operates the elevator.

Q      Which would be something that Schindler might have to maintain, the buttons, correct?

A      Well, I -- I would say that -- *I would say that maintaining that lock would -- that would be something that would be in their best interest also in locking those operational fixtures from unauthorized people.*

Q      That's nice that it's in their best interest, but here we've got a specific direction of whose duty and responsibility it is and it even mentions the word "door" in it, correct?

A      Well, the doors that they're talking about are cab doors.

Q      How do you know that?

A      Because I've read many, many elevator contracts and that's what they're talking about there. They're not talking about a service panel door. They're talking about the doors, which is the cab doors.

Q      It's not a defined term under the contract, is it?

A      What's not a defined term under the contract?

Q      The word "door."

A      I don't know if it is or not, but based on what's written there, they're concerning the cab doors. They're not talking about a service panel door.

Q      You're certain of that?

13

(1:19CV2612)

> A     I'm positive of that.
>
> Q     So you disagree with me that the county is responsible for the maintenance of the interior of that cab?
>
> A     No.  I think they're responsible for the interior of the cab.  *What I'm saying is it could go either way based on this, on whether that service panel door is included in cab interior or whether it's included in operational fixtures.*
>
> Q     Reviewing this and now seeing that Desotell had to run it up the chain of command could mean that he had to check with his superiors about something that they were required to do, correct?
>
>             MR. BILFIELD:     Objection.
>
> A     I don't think so.  Based on the e-mails that we have I believe that he makes the decision to do that.  The only things he asks, is there enough money to have Schindler perform this work.
>
> Q     Something has to be done by the county to approve Schindler's work, correct?
>
> A     Correct.  But based on what I saw, he had that authority, that he approved that work, he just wanted to make sure there was money that was there to approve that work.  But he can't approve work without a proposal.

ECF No. 34 at PageID #: 1424:22-1428:6 (emphasis added).  The County is responsible for maintenance and repair of elevator cab interiors, whereas operational fixtures remain the responsibility of Schindler.  Schindler argues that the access panel to the control operating panel ("COP") is actually an interior door, and that the switches and buttons behind the access panel are not "operational fixtures."  *See* ECF No. 37 at PageID #: 1529.  The Court finds there is a material issue of fact whether the COP of Elevator #5 is part of the cab interior or could be considered an operational fixture.

14

(1:19CV2612)

Viewing Plaintiffs' probative evidence and all reasonable inferences drawn therefrom in the light most favorable to Plaintiffs, the Court concludes that there are genuine issues of material fact and the movant is not entitled to a judgment as a matter of law. For the foregoing reasons, Defendant's Motion for Summary Judgment (ECF No. 37) is denied.

### IV. ECF No. 47

Schindler moves the Court pursuant to Fed. R. Civ. P. 56(e) for an order striking the Affidavit of Todd S. Hochman, M.D., (ECF No. 42-6) and paragraphs 8, 9, 10, 11, 12(3) and 12(4) of the Affidavit of Michael Vallone, (ECF No. 42-1) from Plaintiffs' Brief in Opposition to Defendant's Motion for Summary Judgment. Schindler argues that new opinions are asserted in the affidavits that were not included in their expert reports, and they are outside the time provided for in the prior Order (ECF No. 23).[6] In addition, Defendant contends Vallone's Affidavit is not based on personal knowledge as required by Fed. R. Civ. P. 56(c)(4).

None of the opinions in the affidavit Dr. Hochman are in any way relevant to Schindler's arguments as to liability in its Motion for Summary Judgment. Defendant argues "[t]he only reason Plaintiffs include Hochman's affidavit in support of their Brief in Opposition is because in Paragraph 5, Hochman attempts to opine as to a new injury that was not disclosed in his first report—a right hip labral tear." ECF No. 47 at PageID #: 1727.

---

[6] The prior Order provides, in relevant part: "On or before November 27, 2020, the party that has the burden of proof on an issue(s) shall identify its retained expert witness(es) and provide opposing counsel with a written expert report(s)." ECF No. 23 at PageID #: 487. The Court subsequently granted the parties' Joint Motion (ECF No. 24) and extended the cutoff date to conduct discovery depositions of expert witnesses on damages until March 31, 2021. *See* Non-document Order dated March 4, 2021.

(1:19CV2612)

Dr. Hochman timelyopined, however, about the progression of the treatment and diagnostic testing of Ms. Porter's right hip pain in his first supplemental report dated November 24, 2020. It provides, in relevant part, that "Ms. Porter recently had the right hip MRI[,] which revealed a labral tear[,] and she will need follow up with orthopedics as she has failed conservative treatment and may well be a candidate for arthroscopy with labral repair. . . ." ECF No. 42-6 at PageID #: 1678. Thus, Defendant was aware of the need for further evaluation of Plaintiff's right hip injury, which led to the eventual diagnosis of a right hip labral tear as the source of her years of right hip pain. Defendant apparently turned down a timely offer by the Porters for a second opportunity to cross-examine Dr. Hochman in a supplemental deposition after it received Dr. Hochman's second supplemental report dated March 18, 2021,[7] which was produced after the expert report cutoff date. *See* Plaintiffs' Brief in Opposition (ECF No. 49) at PageID #: 1756, 1758.

The Court agrees this March 2021 opinion as to the right hip labral tear is provided outside the date for expert disclosure in the prior Order (ECF No. 23), and as such is not admissible evidence absent a well-taken motion to reopen discovery for the limited purpose of addressing Dr. Hochman's causation opinion about the right hip labral tear, which Plaintiffs maintain is a significant aspect of Ms. Porter's injuries. *See* ECF No. 49 at PageID #: 1756-57.[8]

---

[7] According to the Porters, this report was provided to Schindler to clarify any ambiguities that arose during Dr. Hochman's March 5, 2021 deposition testimony when he related Ms. Porter's right hip labral tear to the February 13, 2017 elevator incident. *See* Excerpts of Deposition of Dr. Todd S. Hochman (ECF No. 48) at PageID #: 1735-42.

[8] The OBWC concluded that the right hip labral tear did occur in the elevator

(continued...)

16

(1:19CV2612)

Therefore, the Court grants this prong of the Motion to Strike, but may, at a later date, allow Dr. Hochman's causation opinion about the right hip labral tear and Schindler's response to it to be considered in the case at bar.

Pursuant to Fed. R. Civ. P. 56(c) and 56(e), Schindler also moves the Court "to strike all opinion evidence in Vallone's affidavit that references: (1) Schindler and its employees being the only ones with access to the panel; (2) a Schindler employee's carelessness or negligence being responsible for the switch being turned off; and (3) Schindler's failure to turn on the new 3D door reopening device before returning the car[ ] to service." ECF No. 47 at PageID #: 1730. The Court notes that the within ruling on the Motion for Summary Judgment does not rely on Vallone's Affidavit, but does quote from the discovery deposition of Plaintiff's elevator expert. Therefore, the Court denies this prong of the Motion to Strike.

### V. Conclusion

Defendant's Motion for Summary Judgment (ECF No. 37) is denied.

Defendant's Motion to Strike the Affidavits of Todd S. Hochman, M.D. and Michael Vallone (ECF No. 47) is granted in part and denied in part. The Court grants the prong of the motion regarding the Affidavit of Dr. Hochman, but may, at a later date, allow Dr. Hochman's

---

⁸(...continued)
door closing incident on February 13, 2017, and allowed it as part of her OBWC claim. *See* Ohio Industrial Commission Record of Proceedings dated March 26, 2021 (ECF No. 49-2). Therefore, the right hip labral tear is a part of the OBWC's claim against both Ms. Porter and Schindler for the statutory right of subrogation afforded in Ohio Rev. Code § 4123.931 as a result of Ms. Porter's injuries.

(1:19CV2612)

causation opinion about the right hip labral tear and Defendant's response to it to be considered in the instant case. The Court denies the prong of the motion regarding the Vallone Affidavit.

A separate Civil Trial Order will issue.

IT IS SO ORDERED.

   March 29, 2022                                                        */s/ Benita Y. Pearson*  
Date                                                               Benita Y. Pearson  
                                                                    United States District Judge